**Ernest HAWKINS, Plaintiff–Appellee,**

v.

**The CECO CORPORATION,
Defendant–Appellant.**

**No. 88–7075.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 15, 1989.

Rehearing and Rehearing In Banc
Denied Nov. 3, 1989.

Vedder, Price, Kaufman & Kammholz, David J. Middlebrooks, Michael G. Cleveland, Chicago, Ill., for defendant-appellant.

Gordon, Silberman, Wiggins & Childs, Robert L. Wiggins, Jr., Ann K. Norton, Birmingham, Ala., for plaintiff-appellee.

Before TJOFLAT and CLARK, Circuit Judges, and RYSKAMP *, District Judge.

* Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation.

RYSKAMP, District Judge:

Ernest Hawkins filed suit against The Ceco Corporation ("Ceco"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, alleging racial discrimination in employment practice. Ceco claimed that Hawkins was fired for refusing to perform his assigned job and for insubordination to his supervisor. Hawkins, who is black, contended this was merely a pretext for racial discrimination. After a bench trial, the district court entered judgment for Hawkins, permanently enjoining Ceco from discriminating against him, and awarding reinstatement, $33,-916.69 in back pay plus interest, costs and attorneys' fees yet to be determined. Because the finding that Hawkins was fired because of his race is clearly erroneous, the trial court's ruling is reversed.

## I. FACTUAL BACKGROUND

### 1. The employment structure at Ceco

Ceco first hired Hawkins as a helper at its Birmingham plant on February 21, 1983. The plant at that time was split into two departments, the rebar and the form yard. The form yard superintendent was Thomas H. "Junior" Rascoe. Rascoe controlled the operation and made all hiring and firing decisions. He interviewed potential employees and sent those he had decided to hire to the company doctor for a physical examination. With a clean bill of health, the applicant would be officially hired, beginning work at a specific wage group and job title. A start date and the assigned job title were then recorded on the application.

Ceco had five wage groups at its Birmingham plant at this time. The lowest catagory was helper or laborer, an unskilled position. A helper's responsibilities included general manual labor. Three-fourths of the employees under Rascoe's supervision were helpers.

Although hired as a helper, Hawkins did work in the rebar department at some point in time, possibly at higher wage catagory. Because the form yard's workload varied, Ceco laid off Hawkins on three occasions over the next one and one half years but he was rehired at the same position and salary within a few weeks after each layoff.

Nothing in the hiring process indicates that job applicants in the helper catagory were hired to replace a certain individual. Rather, Ceco only filled a vacancy with a new employee if others in that wage group could not absorb the former employee's duties. New employees started at the bottom of the seniority scale.

### 2. The events leading to dismissal

On July 23, 1984, Hawkins was working the evening shift in the form yard, loading the sandblaster. The sandblaster is a closed room with doors on opposite sides. A conveyor belt carries material into the sandblaster through one set of doors and rollers carry the material from the sandblaster out the other doors. A helper loads material on the conveyor and then off loads the material on the other end after it has been sandblasted.

That evening the conveyor belt leading to the sandblaster broke. Oscar Huntley, Hawkins' immediate supervisor, could not fix the conveyor and directed Hawkins to load the sandblaster by hand. Another employee set a pallet of plates on the conveyor belt using a forklift. Hawkins was to load the plates from the pallet into the sandblaster.

Hawkins was concerned that the plates would topple over, but had been ordered by Rascoe not to operate the forklift. Huntley wanted Hawkins either to load the plates into the sandblaster directly from the conveyor or to use the forklift to move the pallet of plates to the floor. The two argued and Hawkins attempted to get a witness to show that he was not refusing to work. Huntley, who is black, then sent Hawkins home. Another helper, Joel Hogland, moved the pallet of plates from the conveyor to the floor with the forklift and loaded the sandblaster. Joel Hogland is white and he performed what would have been Hawkins' duties that evening. Hawkins claims he never refused to do his job, only that he had safety concerns and had been ordered not to run the forklift.

### 3. Huntley's report

Huntley wrote a report of the incident and left it for his supervisor, Rascoe. He stated that he sent Hawkins home for refusing to do the job assigned, but the report did not make any recommendation to fire Hawkins. Huntley did not think it was his prerogative to recommend dismissal of any employee. Huntley reported that he had Hogland take over after Hawkins would not load the sandblaster and claimed that, on the way out the main gate, Hawkins promised something bad would happen to him.

The next day, July 24, Rascoe reviewed the report and conferred with Huntley. He decided to terminate Hawkins, citing his refusal to do the job assigned and his insubordination to a supervisor. That evening and during the next few weeks, Greg Hogland, Joel's younger brother, was responsible for Hawkins' duties. Greg Hogland had had received his physical examination on July 23 and his application shows he started on that date. Within two months, Greg Hogland was promoted to shearman. The next employee hired as a helper was Daryl Bennet, a black, who started work on July 25, 1984.

In his deposition, Rascoe felt Hawkins could be dangerous because once, after requesting a new pair of gloves, Hawkins had remained in the office doorway blocking Rascoe's exit. There was also evidence that, in 1984, blacks were the subject of 90% of the disciplinary measures meted out by the company although blacks constituted only 38% of the work force.

Hawkins timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC denied Hawkins' claim but issued a 'right to sue' letter. Hawkins then sued Ceco in the Northern District of Alabama, alleging he was illegally discharged because of his race.

### 4. The district court's ruling

In a non-jury trial,[1] the district court found that Huntley's report afforded Rascoe a pretextual basis for firing Hawkins.[2] The court determined that Rascoe had a personal dislike and deep-seated resentment of Hawkins stemming from the doorway incident. The court concluded that Rascoe seized every opportunity to criticize Hawkins' performance. The court also found that Ceco had a history of discrimination against black employees.

The court held that Hawkins had proved a *prima facie* case of discrimination by establishing that he was black, that he was qualified, that he was fired by a white, and that he was replaced by a white. The defendant articulated legitimate reasons for discharging Hawkins, in that he refused to perform his assigned job and was insubordinate to a supervisor. The district court held that Rascoe did not rely on the articulated reasons in good faith; rather, they were merely a pretext for racial discrimination. The court ordered Hawkins reinstated with backpay, but Ceco moved for a stay and timely filed this appeal.

## II. THE CONTROLLING LAW

### 1. The *McDonnell–Douglas* analysis

In a Title VII claim for illegal termination based on racial discrimination, the plaintiff must prove that defendant acted with discriminatory intent. *Clark v.*

---

1. Evidence before the court included the live testimony of Hawkins, the plaintiff; Huntley, his supervisor; other Ceco employees and company officials. One of the key witnesses, Junior Rascoe, died before trial began and his testimony was presented by way of his earlier deposition, so the trial court did not have an opportunity to visually appraise his demeanor and credibility.

2. The district court's finding that the report differed from the actual facts is irrelevant to this claim. Because Huntley did not make the decision to fire, his intent and the accuracy of his report need not be considered. The court's responsibility was to determine if Rascoe, relying on Huntley's report, honestly believed that Hawkins was insubordinate or refused to work. *Smith v. Papp Clinic*, 808 F.2d 1449, 1452–53 (11th Cir.1987). Hawkins argues that Rascoe should have conducted a separate investigation, but Rascoe properly relied on his immediate subordinate's report. A lack of concern about the accuracy of a decision will not establish pretext as a matter of law. *Conner v. Ft. Gordon Bus Co.*, 761 F.2d 1495, 1501 (11th Cir.1985).

*Huntsville City Bd. of Educ.,* 717 F.2d 525, 529 (11th Cir.1983). Because direct evidence of discrimination is seldom available, the Supreme Court developed a three step procedure for analyzing circumstantial evidence. *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell–Douglas* procedure allows a court to analyze circumstantial evidence by creating inferences of discriminatory intent. A court accords proper weight to the evidence by shifting burdens of proof. The plaintiff retains the ultimate burden of persuading the trier of fact that the defendant is guilty of intentional discrimination. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

Under *McDonnell–Douglas,* a plaintiff is first required to create an inference of discriminatory intent by establishing a *prima facie* case of racial discrimination. If he cannot do so, then the defendant need not present any reason for its action and the court must determine if the plaintiff has met his ultimate burden. But if the plaintiff does present a *prima facie* case, the defendant may counter the inference of discrimination by articulating some legitimate, non-discriminatory reason for rejecting the employee. *McDonnell–Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant responds by adequately explaining its rationale, the plaintiff, in order to prevail, must present evidence that defendant's proffered reasons are merely pretexts for discrimination. The burden to establish pretext merges with plaintiff's ultimate burden of proof of intentional dis-

crimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

■ By shifting inferences, the court can assess the validity of the articulated rationale for an employee's dismissal, eliminating the most common, non-discriminatory reasons. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1094. The court assumes that employers act with some reason. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If all valid reasons are rejected as pretextual, then it is likely that discrimination was the true reason. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). This analysis pares down the conflicting claims, allowing the court to focus on the ultimate question of whether the defendant intentionally discriminated against the plaintiff. *Aikens,* 460 U.S. at 714–15, 103 S.Ct. at 1481.[3]

#### 2. Standard of review

Intentional discrimination is an issue of fact. *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). A finding of intentional discrimination will be set aside only if clearly erroneous. Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Lincoln v. Bd. of Regents,* 697 F.2d 928, 940 (11th Cir.1983), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983).[4] While this court accords substantial deference to the district court's findings, this deference is not unlimited and "we will hold a finding of fact clearly erroneous if the record lacks sub-

**3.** Of course, merely establishing pretext, without more, is insufficient to support a finding of racial discrimination. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984). The plaintiff must show he suffered intentional discrimination because of his race.

**4.** Conclusions of law are freely reviewable on appeal. *United States v. Grayson County State Bank,* 656 F.2d 1070, 1075 (5th Cir.1981), *cert. denied,* 455 U.S. 920, 102 S.Ct. 1276, 71 L.Ed.2d 460 (1981). While there is authority on both sides of the question as to whether mixed questions of law and fact are subject to a *de novo* review or the clearly erroneous standard, *Pull-*

*man–Standard,* 456 U.S. at 289 n. 19, 102 S.Ct. at 1790 n. 19, there is substantial authority for the view that legal inferences from facts or an application of the law to the facts invites a more rigorous review. *United States v. LULAC,* 793 F.2d 636, 642 (5th Cir.1986); *Washington v. Watkins,* 655 F.2d 1346, 1353 (5th Cir.1981), *cert. denied,* 465 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982); *U.S. ex rel. Johnson v. Johnson,* 531 F.2d 169, 174 (3rd Cir.1976), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976); 9 Wright & Miller, *Federal Practice and Procedure,* Civil § 2589 (1971 & Supp.1988).

stantial evidence to support it". *Lincoln*, 697 F.2d at 939.

### 3. The *Prattco* formulation of a *prima facie* case

Because there is no direct evidence of racial discrimination, Hawkins necessarily relied on the *McDonnell–Douglas* three-step procedure. There are a number of ways of establishing a *prima facie* case pursuant to *McDonnell–Douglas*.[5] The district court found that Hawkins proved a *prima facie* case by meeting the requirements enunciated in *Marks v. Prattco*, 607 F.2d 1153 (5th Cir.1979). Under *Prattco*, a plaintiff must show (1) that he was a member of a protected class, (2) that he was qualified for the position, (3) that he was fired, and (4) that he was replaced by one outside the protected class. *Id.* at 1155. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181 (11th Cir.1984); *Krieg v. Paul Revere Life Ins. Co.*, 718 F.2d 998 (11th Cir.1983), *cert. denied*, 466 U.S. 929, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984); *Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98 (11th Cir.1982).

There is no disagreement that Hawkins met the first three requirements, but Ceco contends that Hawkins was replaced by a black man, Daryl Bennet, and not a white man, Greg Hogland. The district court made a factual finding that Hawkins was replaced by a white man.

### 4. The discharged employee's replacement

■ The standards for determining who actually replaced the discharged employee for purposes of the *prima facie* case of discrimination are not well developed. While few courts have addressed this exact question, the discharged employee's replacement is an effective gauge of intent

because a company's hiring practices may reveal its underlying motivation.[6] Therefore, a hiring procedure that reveals evidence of preference for a nonminority is indicative of discriminatory intent.[7]

■ An employee's position and responsibilities are relevant to determining his or her replacement. Where the employee's position is clearly delineated and responsibilities are well defined, the court should focus on the person that physically replaced the employee or consider whether that job title was actually filled. The plaintiff in *Rollins v. Techsouth, Inc.*, 833 F.2d 1525 (11th Cir.1987), worked as an accounting clerk and trained a nonminority, Richardson, to do her work. Even though the company officially eliminated plaintiff's job title after discharging her, Richardson assumed plaintiff's duties as part of his job after she was terminated. This court found that Rollins presented evidence to show that Richardson replaced her and held that Rollins established a *prima facie* case. *Rollins*, 833 F.2d at 1529.

■ The plaintiff must develop a record to show that a purported replacement actually performed the plaintiff's duties. *Jones v. Western Geophysical Co. of America*, 669 F.2d 280 (5th Cir.1982). In *Jones*, although the plaintiff was classified as a 'mechanic helper,' the evidence showed that job titles were actually broken down into specialized subcatagories and that each required different technical and theoretical levels of expertise. *Id.* at 282. The plaintiff was a layout person who worked the day shift and his alleged replacement was a burner, who worked the night shift and had little or no knowledge of a layout person's skills. The court determined it was not clear that the burner was hired to replace the plaintiff. It held that summary judg-

---

5. *See Nix*, 738 F.2d at 1185.

6. "It is from the defendant's act of hiring a nonminority to replace a minority that a preference for the nonminority, and hence discrimination against the minority, may be inferred." *Ashagre v. Southland Corp.*, 546 F.Supp. 1214, 1219 (S.D.Tex.1982), *aff'd*, 715 F.2d 576 (5th Cir.1983).

7. But the *Prattco* formulation may be satisfied even if a member of a minority class is eventually replaced by another member of that class. In *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1535 (11th Cir.1984), this court was suspicious of the employer's motives where it hired a black eleven months after rejecting plaintiff's application and only after plaintiff, who was black, had filed an EEOC complaint.

ment was improper. *Id.* at 284; *see also, Lindsey v. Mississippi Research and Dev. Center,* 652 F.2d 488 (5th Cir.1981) (magistrate found no *prima facie* case where plaintiff's position in the Economic Development Division left unfilled); *Holland v. Dole,* 591 F.Supp. 983 (M.D.Tenn.1984) (court found probable discrimination in promotion after vacant supervisory position transfered to another town).

■ Where the employee's position requires general labor and little skills or training, it is appropriate to determine who filled the vacancy created by the plaintiff's discharge or who was the next person hired at that skill level. Replacement by a nonminority is the fourth element of a *prima facie* case because it is evidence of preferential treatment for nonminorities in the work place. Where the worker assumed no additional benefits by performing some of the discharged employee's duties, there is no indication of preferential treatment. If an employer uses positions in a job catagory interchangeably, it can be assumed to hire interchangeably as well. Because the duties of a helper involve unskilled labor and the benefits and pay are equal for each position in the catagory, a new employee fills a vacancy in the work force and replaces the discharged employee even if he does not perform the exact same responsibilities of the former employee. *See, e.g., Evans v. Meadow Steel Products, Inc.,* 579 F.Supp. 1391 (N.D.Ga.1984) (where new employees hired as unskilled labor and rotated through different jobs, court re-

viewed hiring and termination list or probationary status list to determine who was next employee hired); *Ashagre,* 546 F.Supp. at 1219 (court found 'replacement' was next person hired, not employee transfered to plaintiff's former position as store clerk for two weeks).

## III. ANALYSIS

### 1. Hawkins' replacement

■ The district judge did not explicitly determine the responsibilities of a helper at Ceco or the type of skill and training required to perform a helper's duties.[8] The evidence shows that, although Joel and Greg Hogland, both white, may have initially done the work that Hawkins was assigned that night, the next laborer to join the work force was a black man. Neither Hogland brother received a promotion for performing Hawkins' responsibilities and neither received training for specific skills required by those duties. Hawkins did not load the sandblaster as a permanent job and received no promotion from his other duties when he did load the sandblaster.

The job category of helper at Ceco is not broken down into specialized subcatagories. It requires no special training or skills. There is also evidence that new helpers fill a vacancy in the work force and do not assume the former employee's specific responsibilities.[9]

There is no evidence to support the district court's finding that Hawkins was re-

---

8. The district court did describe the responsibilities of a laborer who loads the sandblaster, but to the extent this description could be construed to reflect a helper's general responsibilities or, for that matter, Hawkins' overall duties, that finding would be clearly erroneous. The record does not show how Hawkins' responsibilities differed from the duties of any other helper and is inadequate to support a finding that his position had specifically defined skills and responsibilities. Rather, the evidence shows that a helper was a laborer at the bottom of the pay scale. A helper performed general unskilled labor and was subject to layoff when work slowed.

9. The district court in *Ashagre v. Southland Corp.,* 546 F.Supp. 1214 (S.D.Tex.1982), aff'd, 715 F.2d 576 (5th Cir.1983), provided a reasoned

treatment of a similar situation. It found that plaintiff, a black Ethiopian, failed to establish the fourth element of a *prima facie* case in an illegal discharge claim. Plaintiff was discharged from his position as an assistant manager in a convenience store after twice closing a store early and failing to ring up a sale. The evidence showed that a white man, already a Southland employee, replaced plaintiff for two weeks, but that a hispanic female was plaintiff's permanent replacement. Similarly, in the instant case, a white man, already a part of the labor force, replaced Hawkins for a few weeks, but the next permanent replacement hired was a black man. As in *Ashagre,* Ceco's hiring practices do not reveal a preference for nonminorities.

placed by a white man.[10] Greg Hogland was hired on July 23,[11] his brother Joel performed Hawkins's duties that night; Greg performed them for the next few weeks; and Daryl Bennet was hired on July 25. Hawkins was not fired until the morning of the 24th, after Rascoe conferred with Huntley and Daryl Bennet was hired soon after Hawkins was fired. Had Ceco not hired a black man until after Hawkins brought his EEOC or this suit, its actions may have been suspect. *See Howard*, 726 F.2d at 1535. However, Bennet was hired immediately after Hawkins was discharged, compelling the conclusion that he was Hawkins' replacement.

The district court's finding to the contrary is clearly erroneous. The evidence in this record shows that Hawkins' replacement was the next helper hired, Bennet, and not the man who performed his duties for the next few weeks. Because Hawkins did not meet the fourth requirement of showing he was replaced by a white, he failed to establish a *prima facie* case. *See Coleman v. Braniff Airways, Inc.*, 664 F.2d 1282 (5th Cir.1982) (plaintiffs may not prevail where they failed to establish *prima facie* case because not replaced by nonminorities).

While this court's inquiry should not be "obscured by the blindered recitation of a litany," *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86 (5th Cir.1982), neither can it ignore the failure to present evidence of discrimination. "The aim of the *Prattco* test, and particularly of its fourth element, is to identify 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under the Act.'" *Byrd*, 687 F.2d at 86, *citing Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957

(1978). Ceco's actions in terminating Hawkins do not reveal any discriminatory criterion. The conclusion that Hawkins was replaced by a white man, and thus had met all the *Prattco* requirements, undermines the function of the *prima facie* case in a discriminatory discharge case. Without the underlying suggestion of an illegal preference for a nonminority, there can be no inference of discrimination.

#### 2. Other *prima facie* case formulations

As Hawkins notes, a plaintiff is not required to show that a white employee filled his position in order to prove his racial discrimination case. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1560 (11th Cir.1986), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). Rather he may rely on one of the other methods of establishing a *prima facie* case. *Nix, supra*, 738 F.2d at 1185. The trial judge relied on the *Prattco* formulation of a *prima facie* case, but Hawkins could also have shown that he was qualified for his position and was discharged for misconduct which was nearly identical to that engaged in by one outside of the protected class whom the employer retained. *Nix*, 738 F.2d at 1185; *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982). If disciplinary rules are applied discriminatorily, it is unnecessary to show that plaintiff was replaced by a nonminority. *Cockrham v. South Central Bell Telephone Co.*, 695 F.2d 143, 145 (5th Cir.1983).

The trial court did not find that Hawkins was treated differently than white employees charged with the same misconduct, but a review of the evidence and the trial transcript discloses that Hawkins did not establish that white employees guilty of insubordination or refusal to work were not dismissed. The charges against Hawkins were punishable by dismissal ac-

---

**10.** In its order, the district court mistakenly stated that Joel Hogland replaced Hawkins. Order, p. 5. The only evidence before the court showed that Joel Hogland performed the job Hawkins had been doing only on the evening Hawkins was sent home and that his brother, Greg Hogland, performed those duties for the next few weeks.

**11.** At trial, counsel did question the validity of Greg Hogland's starting date, implying that an erasure on the application could have obscured a later date. Record, p. 204. But the application was accepted into evidence without objection, the court made no factual finding, and the only evidence before the court shows that Greg Hogland started work on July 23.

cording to Ceco's rules. There is no evidence that employees who were charged with insubordination or refusal to do the assigned job were not discharged.

Hawkins does claim that three white employees were accused of stealing and not dismissed as required by Ceco's rules. But the employees did not violate the "same work rule" that Hawkins violated. *Nix*, 738 F.2d at 1186. The district court did not find that stealing and insubordination are similar conduct and neither can we find a *prima facie* case upon this evidence. Testimony shows that Ceco regularly gave employees a second chance and that it had inadequate evidence to prove who actually stole the material. Finally, there was evidence that Hawkins was given a number of 'second chances' before being dismissed for refusal to do his job and for insubordination. The district court did not find that appellee was discharged for misconduct which was nearly identical to that of an employee outside the minority group who was retained. *Nix*, 738 F.2d at 1185; *Davin*, 678 F.2d at 570. On this record, Hawkins did not establish a *prima facie* case for racial discrimination based on disparate treatment.

 A plaintiff may also establish a *prima facie* case by presenting statistical proof of a pattern of discrimination. *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 (11th Cir.1988). Although there was scant statistical evidence, the district court found that Ceco had a history of discrimination against its black employees. In justifying this conclusion, the court noted that Huntley was the only black salaried employee from 1976 to 1986, that Rascoe was given a supervisory position that Huntley was qualified for, that Joel (sic) Hogland "leapfrogged" senior black employees, and that blacks accounted for 90% of the disciplinary measures imposed in 1984, even though they accounted for only 38% of the work force.

 None of this evidence adequately supports a claim of racial discrimination or establishes a *prima facie* case. Substantial statistical proof alone may establish a *prima facie* case of racial discrimination.

*James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 328–29 (11th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978). But this evidence is not complete nor compelling. Without comparative evidence regarding the number of salaried positions at Ceco, it is difficult to assess the importance of the fact that Huntley was the only black employee on salary for ten years. The record also shows that, before assuming the Birmingham position, Rascoe had been a supervisor at another Ceco facility. When that facility closed, he was moved into the vacancy at the Birmingham plant. Although Huntley had been at the Birmingham facility earlier and was qualified, he did not have as much experience as Rascoe. Huntley did supervise the evening shift, although he reported to Rascoe, who supervised the day shift. Evidence that Greg Hogland was promoted is not indicative of discrimination unless there is a showing that he was less qualified than the senior employees who were bypassed. The statistical evidence regarding discipline in 1984 does not establish or necessarily imply racially discriminatory practices. *Thompson v. Leland Police Dept.*, 633 F.2d 1111, 1114 (5th Cir.1980). It compares discipline imposed on collective bargaining employees with the total number of employees in the entire workforce, not just collective bargaining employees. Comparative evidence derived from more than one year would be more indicative of illicit practices. None of this evidence is sufficient to establish a *prima facie* case of racial discrimination.

### 3. Intentional discrimination

Because Hawkins failed to present a *prima facie* case of discrimination, this court need not examine Ceco's articulated reasons for discharging him, nor determine whether these reasons were merely a pretext for discrimination, although it is clear that insubordination and failure to do the work assigned are grounds for dismissal at Ceco. The court must, however, address the ultimate question of whether Ceco in-

tentionally discriminated against Hawkins. *Lindsey,* 652 F.2d at 491.

■ In the record, there is no direct evidence [12] of racial discrimination against Hawkins, such as discriminatory statements by Ceco,[13] or written notations.[14] Hawkins presented evidence that Rascoe did not like him, but a dislike alone is not evidence of racial discrimination. In fact, an admitted bias would not necessarily translate into discriminatory intent. *See Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir.1983).[15] Appellee failed to present a *prima facie* case of racial discrimination using circumstantial evidence and there is no basis for affirming the district court's determination that Ceco intentionally discriminated against Hawkins. The district court's finding is overruled as clearly erroneous pursuant to Rule 52(a).

## IV. CONCLUSION

The district court's determination that Hawkins established a prima facie case was clearly erroneous because Hawkins was replaced by a black man, failing to meet the fourth requirement in *Prattco.* Because the finding of intentional discrimination rested on Hawkins establishing a prima facie case under *Prattco* and there is no other evidence of racial discrimination, the district court's finding of intentional discrimination is reversed as clearly erroneous. The district court's judgment and order reinstating appellee, issuing a permanent injunction, and granting appellee backpay, attorney's fees, and expenses is vacated [16] and this cause is remanded to the district court with instructions to enter judgment for Ceco.

**12.** Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption. *Carter v. City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989).

**13.** *See Conner,* 761 F.2d at 1498, n. 4. If plaintiff presents direct evidence of discrimination, then the *McDonnell–Douglas* analysis is inapplicable. *Thompkins v. Morris Brown College,* 752 F.2d 558, 563 (11th Cir.1985). Defendant could rebut the *prima facie* case of discrimination and prevail only by showing by a preponderance of the evidence that plaintiff would have been fired even without a discriminatory motive. *Id.*

REVERSED, VACATED and REMANDED.

**14.** *See, e.g., Williams v. General Motors Corp.,* 656 F.2d 120, 130 (5th Cir.1981).

**15.** In *Sweat,* the court noted that bias does not necessarily translate into intent and found that, even where there was evidence the employer was biased against older people and women, a factual question existed as to intent. 708 F.2d at 656–57.

**16.** This court's conclusion renders unnecessary any consideration of Ceco's claims that the trial court awarded excessive damages.